RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TERRY LYNN KING,

               *Petitioner-Appellant,*

    *v.*

BRUCE WESTBROOKS, Warden,

               *Respondent-Appellee.*

No. 13-6387

───────────────

Appeal from the United States District Court for
the Eastern District of Tennessee at Knoxville.
No. 3:99-cv-00454—Robert Leon Jordan, District Judge.

Argued: September 28, 2016

Decided and Filed: February 9, 2017

Before: BATCHELDER, MOORE, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Dana C. Hansen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Jennifer L. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Dana C. Hansen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, Wade V. Davies, Stephen Ross Johnson, RITCHIE, DILLARD, DAVIES & JOHNSON, P.C., Knoxville, Tennessee, C. Mark Pickrell, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, for Appellant. Jennifer L. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. This death penalty case arises out of the kidnapping and murder of Diana K. Smith by Petitioner-Appellant Terry King. Following the district court's dismissal of King's petition for a writ of habeas corpus, we granted a certificate of appealability on two issues: whether trial counsel was ineffective for failing to present during the trial testimony about King's intoxication at the time of the murder and whether trial counsel was ineffective for failing to investigate adequately King's mental health and to obtain expert assistance in a timely manner. For the reasons stated below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

At trial, the Government put forth the testimony of two individuals to whom King confessed: Jerry Childers,[1] an acquaintance of King, *see* Trial Tr. ("TT") Vol. IX at 52 (Childers Test.), and David Davenport, *id.* at 84 (Davenport Test.), an investigator for the Tennessee Bureau of Investigation. Childers described a conversation he had with King, *see id.* at 53–69 (Childers Test.), and Davenport read statements that he took from King and Randall Joe Sexton, King's co-defendant, at the Knox County Sherriff's Department, *see* TT Vol. IX at 86 (Davenport Test.); *id.* at 90–94 (Davenport Test., Sexton Statement); TT Vols. IX–X at 100–05 (Davenport Test., King Statement). The following is a summary of that testimony.

On July 31, 1983, King; his cousin, Don King; a man named Eugene Thornhill; and the victim, Diana K. Smith, consumed large amounts of alcohol, LSD, and Quaaludes and engaged in sexual intercourse throughout the day. *Id.* at 100–01 (Davenport Test., King Statement). At

---

[1]Although Childers's name is spelled "Childress" in the trial court transcript, *see, e.g.*, TT Vol. IX at 51 (Childers Test.), King explains in his brief that his name is actually spelled "Childers." *See* Appellant's Br. at 10 n.3. Because the Government and previous courts have also spelled his name "Childers," *see, e.g.*, Appellee's Br. at 11; *State v. King*, 718 S.W.2d 241, 243 (Tenn. 1986); *King v. State*, 989 S.W.2d 319, 330 (Tenn. 1999); *but see King v. Bell*, No. 3:99-cv-454, 2011 WL 3566843, at *1 n.4 (E.D. Tenn. Aug. 12, 2011); *King v. State*, No. 03C01-9601-CR-00024, 1997 WL 416389, at *8 (Tenn. Crim. App. July 14, 1997), we use this spelling throughout this opinion.

one point, King and Smith drove to a wooded area in Smith's car, where Smith accused King and the others of raping her. TT Vol. IX at 56 (Appellant's App'x at 110) (Childers Test.); TT Vol. X at 101 (Davenport Test.). In response, King told Smith to get into the trunk of the car. TT Vol. IX at 56 (Appellant's App'x at 110) (Childers Test.); TT Vol. X at 101–02 (Davenport Test., King Statement). With Smith in the trunk, King drove to Sexton's house, where King obtained a rifle and shovel. TT Vol. IX at 56 (Appellant's App'x at 110) (Childers Test.); *id.* at 91 (Davenport Test., Sexton Statement); TT Vol. X at 102 (Davenport Test., King Statement). King and Sexton then drove to a wooded area, where King ordered Smith out of the trunk and shot her in the back of the head. TT Vol. IX at 67–68 (Childers Test.); TT Vol. X at 102–03 (Davenport Test., King Statement). After unsuccessfully attempting to bury Smith, King and Sexton went home. TT Vol. X at 103 (Davenport Test., King Statement). The following day, King and Sexton returned to the scene and disposed of Smith's body in a nearby quarry. TT Vol. IX at 92 (Davenport Test., Sexton Statement); TT Vol. X at 103 (Davenport Test., King Statement).

In preparation for trial, which began on January 23, 1985, *see* Post–conviction Tr. ("PCT") Vol. V at 426 (Appellant's 2d Supp. App'x at 796) (Simpson Test.), King's trial counsel, Robert R. Simpson, suspected that King may have had brain damage as a result of a childhood head injury and substance abuse. PCT Vol. IV at 376, 381–82, 384 (Appellant's 2d Supp. App'x at 744, 749–50, 752) (Simpson Test.). In addition to a childhood head injury, in 1982, King—then about nineteen years old—hit his head in a car accident and had double vision for a couple of months afterwards. R. 254-3 at 4 (Gebrow Report at 2) (Page ID #475). From age eight to sixteen, King sniffed gasoline. *Id.* at 5 (Gebrow Report at 3) (Page ID #476). He also consumed alcohol beginning at age twelve or thirteen and LSD and Quaaludes beginning at age fifteen or sixteen. *Id.* at 4–5 (Gebrow Report at 2–3) (Page ID #475–76).

On January 15, 1985, Simpson retained a mental-health expert, Martin Gebrow, M.D., to evaluate King. Simpson used private funds from King's family to pay for Dr. Gebrow's services because Simpson was unaware of state law that provided for state funding of an expert. PCT Vol. V at 424, 431–32 (Appellant's 2d Supp. App'x at 794, 801–02) (Simpson Test.). Dr. Gebrow's report indicated that he evaluated King on January 23, 1985. R. 254-3 (Gebrow

Report at 1) (Page ID #474). The report described King's background, including his history of substance abuse. *Id.* at 1–3 (Page ID #474–76). Dr. Gebrow concluded, "My examination of Mr. King did not reveal any evidence of psychotic thought process. Nor did it reveal any evidence of an organic brain syndrome such as might have been caused by the chronic use of hydrocarbons by inhalation, alcohol, or LSD." *Id.* at 3–4 (Page ID #476–77). He continued, "This however does not mean that any brain damage does not exist. It would be my recommendation that Mr. King have an electroencephalogram and psychological testing to rule out organicity and/or major thought disorder." *Id.* at 4 (Page ID #477).

During voir dire, Simpson made an oral motion to "permit the taking of an electroencephalogram" of King, TT Vol. VII at 552–53 (Appellant's App'x at 158–59), which is "a brain wave test that measures the electrical activity of the brain and can ascertain whether or not there are any abnormal electrical discharges which would indicate brain damage," TT Vol. VIII at 642 (Gebrow Test.). In a hearing on the motion, during which Dr. Gebrow testified, the trial court inquired of Dr. Gebrow whether there was "a substantial possibility of damage." *Id.* at 657. Dr. Gebrow responded, "With the eight year—eight-or-nine-year history of constant hydrocarbon abuse, I think that there would be—could be an excellent chance that this was—that there was some damage" but that it was not a "probability." *Id.* at 658. Dr. Gebrow also agreed that, based on the examination, King was coherent, his memory appeared to be intact, and that he was able to express himself well. *Id.* Because Dr. Gebrow "went in cold to do the evaluation," *id.* at 655, he was not aware of certain conditions that he admitted would affect the evaluation, including prior psychological testing, *id.* at 648, and evidence of antisocial behavior, *id.* at 665–66. As a result, the trial court denied King's motion but noted that it would reconsider if Dr. Gebrow reviewed more of King's medical records and decided that an electroencephalogram would still be required. *See id.* at 670. Having reviewed these records, Dr. Gebrow testified later at trial that an electroencephalogram was not necessary. TT Vol. XII at 383 (Gebrow Test.).

Simpson suggested in his opening statement that King's intoxicated state influenced his actions:

> We think the proof will show that whatever happened to Mrs. Smith, Mr. King's involvement was the product of an incredible quantity of intoxicants. And we think the proof will show that he cannot be held legally responsible for all of his actions to the degree the State would ask you, simply because of the vast quantities of intoxicants that he consumed. And the proof is going to be very clear on that point.

TT Vol. IX at 10 (Appellant's App'x at 161). Simpson's trial strategy changed when King's former girlfriend, Lori Eastman Carter ("Carter"), testified. Carter described an incident on October 13, 1982, in which King assaulted her in her car. TT Vol. XI at 278–79 (Appellee's App'x at 203–04). She testified that King struck her, causing her to lose consciousness, and that when she became conscious, "he pulled me from the floorboard by my hair, rolled my hair up in the car window, and continued to beat me around my face and neck." *Id.* at 279 (Appellee's App'x at 204). She continued, "Several times he said that he wanted me to tell him—he asked me if I knew that I was dying, and I said yes. And he wanted me to tell him how it felt to be dying, so that the next woman he killed he would know how she felt." *Id.* After losing and regaining consciousness once more, Carter overheard King telling his brother, James King, that he killed Carter and that he needed help putting her body in a quarry. *Id.* at 280 (Appellee's App'x at 205). Carter did not say whether King was sober when he attacked her.

At the penalty phase, King's mother, Billie King, testified that she would find King sniffing gasoline when she came home from work: "Well, you could tell that he had—he had a motorcycle. It was tore up, but it was on the back porch. And he had the gas cap off from the motorcycle. And you could tell that he had been into the gas, and he couldn't hardly sit up. And I whipped him, you know. He promised me he'd never do it again." TT Vol. XIII at 496. Similarly, King's brother, Gary Edward King, testified that following his father's death, King would sniff gasoline "several times a week." TT Vol. XIV at 509. King also called Robert Booher, M.D., a specialist in "addictionology," to testify about the general effects of LSD, Quaaludes, and alcohol. TT Vol. XVI at 730–37.

Ultimately, the jury found King guilty of first-degree murder and recommended death by electrocution, which the trial court imposed. *See State v. King*, 718 S.W.2d 241, 243 (Tenn. 1986). Following an unsuccessful direct appeal, *see id.*, King filed a petition for post–conviction relief in state court, in which he raised, among other claims, the same ineffective assistance of

counsel claims that are the subject of this appeal.  *See King v. State*, No. 03C01-9601-CR-00024, 1997 WL 416389, at *1, 12–17 (Tenn. Crim. App. July 14, 1997).  At post–conviction proceedings, King called a clinical psychologist, Pamela Auble, Ph.D, who had evaluated King and reviewed his medical records.  PCT Vols. I–II at 76, 99–100, 106–07 (Appellant's 2d Supp. App'x at 439, 462–63, 471–72) (Auble Test.).  She testified, "The psychological testing that I have done and that has been done—the evaluation by Dr. Gebrow that was done prior both raise the question of potential brain damage.  This issue still needs to be explored, is not yet conclusive, but is a possible thing that could be explored."  PCT Vol. II at 148, 168 (Appellant's 2d Supp. App'x at 513, 533) (Auble Test.).  She also testified that she had reviewed a report by a Dr. Kaminski, who performed an EEG on King that "showed negative results."[2]  *Id.* at 167 (Appellant's 2d Supp. App'x at 532) (Auble Test.).  She further observed that there was no evidence of psychotic thought process.  *Id.*

In addition to Dr. Auble, Simpson testified during post–conviction proceedings on his decision not to raise an intoxication defense.  He stated that "The testimony of Lori Eastman [Carter] was, from our perspective, totally unexpected and very devastating.  It really skewed how we were looking at this case.  We dropped the idea, after that, of even raising intoxication in the hopes of getting a second-degree murder conviction, which we had viewed as slim, anyway, and just decided to proceed with it in the penalty phase and raise it there, because of her testimony, apparently when he was sober, of nearly beating her to death."  PCT Vol. IV at 400 (Appellee's 2d App'x at 768) (Simpson Test.).  Characterizing her testimony as "Pretty devastating stuff," he continued:  "But that really skewed our defense, and we wanted out of that phase as quick as we could and focus the jury on our side of the case, and our side of the case was as long as the guilt-innocence phase."  *Id.* at 400–01 (Appellee's 2d App'x at 768, 771) (Simpson Test.).

---

[2]Dr. Auble testified on September 26, 1994.  PCT Vol. I at ii (Appellant's 2d Supp. App'x at 360).  In a report she prepared prior to testifying, Dr. Auble wrote, "Mr. King was evaluated by Dr. Gary Solomon on August 16–17, 1990 at the request of Dr. Michael Kaminski.  Apparently, Dr. Kaminski had seen Mr. King for a neurological evaluation for severe headaches and episodic loss of balance.  I do not have Dr. Kaminski's report."  Auble Report at 5 (Appellant's App'x at 40).  However, later in her testimony, she stated that she had access to Dr. Kaminski's report.  PCT Vol. I at 100 (Appellant's 2d Supp. App'x at 463).  At oral argument for the instant proceedings, counsel was unable to clarify whether Dr. Auble reviewed Dr. Kaminski's report.  It appears from her 1994 testimony that Dr. Auble reviewed Dr. Kaminski's report between writing her report and testifying at the post–conviction proceedings.

The trial court denied King's petition for post–conviction relief, and the Tennessee Court of Criminal Appeals and Tennessee Supreme Court affirmed its judgment. *See King v. State*, 989 S.W.2d 319, 321 (Tenn. 1999); *King*, 1997 WL 416389, at *19. King then filed a federal petition for a writ of habeas corpus, in which he raised the same ineffective-assistance-of-counsel claims. *See King v. Bell*, No. 3:99-cv-454, 2011 WL 3566843, at *20–26 (E.D. Tenn. Aug. 12, 2011). At this stage, King called expert witnesses who stated that in fact King had organic brain damage at the time of Smith's death. An evaluation by James R. Merikangas, M.D., P.C., on June 27, 2000, demonstrated with "a reasonable degree of medical certainty that Mr. King suffers from brain damage and did so at the time of the crime for which he stands convicted." Merikangas Report at 3 (Appellant's App'x at 48). Dr. Merikangas also stated that King does not have antisocial personality disorder, but rather "brain damage which is no fault of his own." *Id.* at 4 (Appellant's App'x at 49). On March 21, 2001, a psychiatrist named Robert L. Sadoff, M.D., evaluated King and, after reviewing King's previous medical records, including Dr. Merikangas's report, concluded that "[i]t was the combination of all these factors, including his intoxication by several substances at the same time, his brain damage and his personality disorders that substantially impaired his capacity to conform his conduct to the requirements of the law." Sadoff Report at 22 (Appellant's App'x at 79). Finally, a physician named Murray W. Smith, M.D., evaluated King and, in a February 7, 2001 affidavit, stated "Any pre-existing brain damage resulting from the very heavy and frequent use of inhalants from age 8 to age 16, as well as the use of cocaine and amphetamine as found in my evaluation of Mr. King, would further multiply the effects of the alcohol and drugs on the causation of the violent interaction Mr. Terry King had with Ms. Diana Smith." Smith Aff. at 2 (Appellant's App'x at 53). Ultimately, the district court awarded summary judgment against King and dismissed his petition. King has appealed the district court's judgment.

## II. DISCUSSION

We granted a certificate of appealability on two questions: (1) "[W]hether trial counsel was ineffective for failing to present testimony about King's intoxication at the time of the murder during the trial" and (2) "[W]hether trial counsel was ineffective for failing to adequately

investigate King's mental health and obtain expert assistance in a timely manner." Certificate of Appealability at 2. For the reasons stated below, the answer to both questions is no.

## A. Standard of Review

When reviewing a district court's denial of a § 2254 petition, "[t]his court reviews de novo [the] district court's legal conclusions and mixed questions of law and fact and reviews its factual findings for clear error." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013). King is entitled to relief only if the Tennessee Supreme Court—which issued "the last reasoned state-court opinion" in this case, *Ylst v. Nunnemaker*, 501 U.S. 797, 804–05 (1991)—adjudicated King's ineffective-assistance claims on the merits in a way that:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2012).

The Tennessee Supreme Court, applying *Strickland* and Tennessee ineffective-assistance case law, rejected both of the ineffective-assistance claims that King raises in this appeal. *King*, 989 S.W.2d at 330–32 (intoxication defense); *id.* at 332–33 (mental-health investigation). The district court also rejected both claims in its order denying King's § 2254 petition. *King*, 2011 WL 3566843, at *20–23 (intoxication defense); *id.* at *24–26 (mental-health investigation).

## B. King's Ineffective Assistance of Counsel Claims

To demonstrate that his counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), King must make two showings: "(1) [his] counsel's performance was deficient, or put differently, 'fell below an objective standard of reasonableness'; and (2) the performance prejudiced [King]." *United States v. Mahbub*, 818 F.3d 213, 230–31 (6th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). Because the *Strickland* standard is already "highly deferential," *Strickland*, 466 U.S. at 689, our review of a state-court decision on a *Strickland* claim is "doubly deferential" under the Anti-Terrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). *Cullen v. Pinholster*, 563 U.S. 170, 189–90 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). However, "[w]hen a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court. The unadjudicated prong is reviewed de novo." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

Although the Tennessee Supreme Court did not specifically state how it ruled on either *Strickland* prong, it is clear from the substance of its decision that it decided the intoxication defense ineffective-assistance-of-counsel claim based on the deficient-performance prong and the mental-health-expert ineffective-assistance-of-counsel claim based on the prejudice prong. With respect to the intoxication defense ineffective-assistance-of-counsel claim, the court held as follows:

> Although we acknowledge that defense attorneys should strive to present a consistent theory of defense at trial, we must avoid judging the tactical decisions of counsel in hindsight. We have reviewed the circumstances from counsel's perspective at the time and conclude that the change in strategy does not rise to the level of ineffective assistance.

*King v. State*, 989 S.W.2d at 331–32 (citing *Strickland*, 466 U.S. at 689; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). Because the court focused on Simpson's "tactical decisions" and trial strategy, it appears to have concluded that Simpson's performance was not deficient. And with respect to the mental-health expert ineffective-assistance-of-counsel claim, it held as follows:

> The trial court concluded . . . that even if defense counsel had initiated the mental health evaluations earlier, there was no proof that a more favorable report would have been obtained. We find no evidence to preponderate against that finding. Moreover, the record reflects that counsel presented evidence through lay witnesses that was remarkably similar to the information provided by Dr. Auble. Appellant's counsel were not ineffective on this issue.

*Id.* at 333. Because the court focused on the effect mental-health experts would have had on the defense, and not whether Simpson's failure to retain those experts hurt King's defense, it appears to have concluded that Simpson's performance, regardless of its deficiency, did not prejudice King. Nevertheless, we will analyze the deficiency prong of King's intoxication defense

ineffective-assistance claim and the prejudice prong of King's mental-health-expert ineffective-assistance claim de novo "because, even under that more liberal standard of review, we conclude that his counsel was not deficient." *See Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir. 2011) (en banc).

**1. Intoxication Defense**

King argues that his trial counsel was ineffective during the guilt phase of King's trial for failing to present evidence that King was severely intoxicated when he murdered Smith. Appellant's Br. at 29. That evidence, King contends, would have shown that King lacked the capacity "to form the specific intent for first-degree murder." *Id.* at 31; *see id.* at 29 (same). As stated above, we review the deficiency prong of this claim de novo.

Determining whether an attorney's representation "fell below an objective standard of reasonableness" requires a court to consider "all the circumstances." *Strickland*, 466 U.S. at 687–88. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89. In addition, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In light of this standard and the manner in which the trial unfolded, we conclude that Simpson's representation did not fall below an objective standard of reasonableness.

Simpson's view that Carter's testimony was "very devastating" is wholly supported by the circumstances of the case. Carter testified that King struck her unconscious with a slapstick, "rolled [her] hair up in the car window," and "beat [her] around [her] face and neck." TT Vol. XI at 279, 281–82 (Appellant's App'x at 96, 98–99) (Carter Test.). Her testimony that King asked her "how it felt to be dying, so that the next woman he killed he would know how she felt" could be seen as an ominous reference to Smith. *See id.* at 279 (Appellant's App'x at 96) (Carter Test.). Finally, that King considered putting Carter's body—and actually put Smith's body—in a quarry demonstrates a premeditation common to both attacks that could frustrate an intoxication defense. *See* TT Vol. IX at 92 (Davenport Test., Sexton Statement); TT Vol. X at 103 (Davenport Test., King Statement); TT Vol. XI at 280 (Appellant's App'x at 97) (Carter Test.).

Yet another reason for Simpson to abandon the intoxication defense was that King "apparently" was sober when he attacked Carter. PCT Vol. IV at 400 (Appellant's 2d Supp. App'x at 768) (Simpson Test.). If King appeared to be sober when he attacked Carter, an already "slim" intoxication defense, *id.*, would become even slimmer. King argues that Simpson had an inaccurate understanding of Carter's testimony when Simpson stated that King assaulted Carter "apparently when he was sober." *See id.* In truth, it was the Tennessee Supreme Court, but not necessarily Simpson, that had an inaccurate understanding of Carter's testimony. The record does not support that court's conclusion that "Ms. Carter testified that the appellant was sober when he attacked her with the slapstick" because Carter did not specifically state whether King was sober. *See King*, 989 S.W.2d at 331. Crucially, however, Simpson never claimed that Carter stated that King was sober; Simpson said that King "apparently" was sober. *See* PCT Vol. IV at 400 (Appellant's 2d Supp. App'x at 768) (Simpson Test.). Tone, mannerisms, and the like are impossible to discern from the cold record before us, so we will not second-guess Simpson's conclusion on what was "apparently" so in Carter's testimony. Therefore, and in light of Carter's testimony, it was not unreasonable for Simpson to get "out of [the guilt] phase as quick as we could and focus the jury on our side of the case." *See* PCT Vol. V at 401 (Appellant's 2d Supp. App'x at 771) (Simpson Test.). Accordingly, King has failed to demonstrate deficient performance of his trial counsel, and we **AFFIRM** the judgment of the district court on this ineffective-assistance-of-counsel claim.

## 2. Mental-Health Expert

King next argues that his counsel was constitutionally ineffective at the guilt and penalty phases for failing to investigate King's mental health on a timely basis and to obtain expert assistance concerning the same. Specifically, King focuses on his attorney's allegedly untimely retention of Dr. Gebrow. As discussed above, we review the deficient performance prong de novo because the state court did not address this prong. We also review the prejudice prong de novo because "even under that more liberal standard of review, we conclude that his counsel was not [ineffective]." *See Davis*, 658 F.3d at 537.

There is no question that Simpson's delay in retaining Dr. Gebrow fell below an objective standard of reasonableness. "An attorney's ignorance of a point of law that is

fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" *Hinton v. Alabama,* 134 S. Ct. 1081, 1088–89 (2014) (citing *Williams v. Taylor,* 529 U.S. 362, 395 (2000)). Section 40-14-207 of the Tennessee Code, which has not been amended since the time of King's trial, states in relevant part,

> In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, the court in an *ex parte* hearing may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Tenn. Code Ann. § 40-14-207(b) (West 2002). At a hearing on King's state petition for post–conviction relief, trial counsel stated that he "was unaware of" his ability to obtain state funds in order to hire an expert for King under this section. PCT Vol. V at 424 (Appellant's 2d Supp. App'x at 794) (Simpson Test.). He also indicated that he waited to receive private funds before retaining Dr. Gebrow because he was unaware of this section. *Id.* at 425 (Appellant's 2d Supp. App'x at 795) (Simpson Test.). King was charged with first-degree murder; his mental state at the time he killed Smith was a critical factor in the jury's determination that he was guilty and that he deserved a death sentence. Such an "inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him" constitutes deficient performance. *See Hinton,* 134 S. Ct. at 1089. Nevertheless, because King has not shown that he was prejudiced by this deficient performance, he has not demonstrated ineffective assistance of counsel.

Even reviewing the prejudice prong de novo, we conclude that habeas relief is not warranted. Fundamentally, King has not shown, with the evidence properly available to us on federal habeas review, that the timely retention of a mental expert would have produced any evidence different from what was already available at the time of trial. Dr. Gebrow testified at a hearing on King's motion to continue the trial that "with the history of gasoline inhalation that there might be a generalized diffused type of brain damage" and that "[y]ou could also find, possibly, some focal point of brain damage." TT Vol. VIII at 644 (Gebrow Test.). He stated, "That is the reason that I requested or recommended that an electroencephalogram and

psychological testing be done." *Id.* To support his argument that his trial counsel should have obtained a mental expert earlier, King introduced Dr. Auble during post–conviction proceedings. Similarly to Dr. Gebrow, she testified, "The psychological testing that I have done and that has been done—the evaluation by Dr. Gebrow that was done prior both raise the question of potential brain damage. This issue still needs to be explored, is not yet conclusive, but is a possible thing that could be explored." PCT Vol. II at 148 (Appellant's 2d Supp. App'x at 513) (Auble Test.). She also acknowledged that an electroencephalogram had been performed on King that showed negative results, but that it still had not been determined whether there was evidence of organic brain syndrome. *Id.* at 167–68 (Appellant's 2d Supp. App'x at 532–33) (Auble Test.). Based on Dr. Auble's nearly identical uncertainty regarding whether King had brain damage, King has not shown that "[t]imely securing the services of an expert would have provided counsel with an expert opinion that related the impact of intoxication and brain damage on King's judgment and behavior at the time of the crime and King's ability to form specific intent for first-degree murder," Appellant's Br. at 75, let alone whether there would be a reasonable probability of a different outcome. *See Strickland*, 466 U.S. at 695–96. Therefore, King has not shown that he was prejudiced by the delay in retaining a mental-health expert.

To be sure, the findings of the mental-health experts on federal habeas review are troubling. Although the experts presented at trial and during state post–conviction proceedings were never able definitively to determine whether King had brain damage, we now know that King "suffers from brain damage which is no fault of his own." Merikangas Report at 4 (Appellant's App'x at 49). Unfortunately for King, AEDPA does not permit us to consider this evidence. Section 2254(e)(2) controls the admissibility of evidence on federal habeas review:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> > (A) the claim relies on—
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). This provision controls even if the petitioner seeks relief based on new evidence without an evidentiary hearing. *See Holland v. Jackson*, 542 U.S. 649, 653 (2004). "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Pinholster*, 563 U.S. at 186 (citation omitted).

The mental-health experts to whom King points at this late stage cannot be considered because they could have been discovered through the exercise of due diligence of post–conviction counsel. *See Roberts v. Dretke*, 356 F.3d 632, 641 (5th Cir. 2004) ("Seeking and presenting medical records and affidavits from family members available at the time of the state habeas hearing is within the exercise of due diligence."). Each of the medical reports presented for the first time on federal habeas review necessarily relies on information that was available at the time of post–conviction review; they draw conclusions on King's mental health at the time of the crime. Indeed, that King was able to obtain the medical report from Dr. Auble during state post–conviction proceedings demonstrates that he could have obtained expert opinions at that time. Therefore, with the evidence that can be considered on federal habeas review, we conclude that King has not shown that he was prejudiced by trial counsel's deficient performance, and habeas relief is unwarranted. *See Strickland*, 466 U.S. at 687.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.