RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EDWARD LANG,

　　　　　　　　*Petitioner-Appellant,*

　　　*v.*

DAVID BOBBY, Warden,

　　　　　　　　*Respondent-Appellee.*

No. 15-3440

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:12-cv-02923—Jack Zouhary, District Judge.

Argued: March 6, 2018

Decided and Filed: May 11, 2018

Before: SILER, MOORE and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael J. Benza, THE LAW OFFICE OF MICHAEL J. BENZA, INC., Chagrin Falls, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, THE LAW OFFICE OF MICHAEL J. BENZA, INC., Chagrin Falls, Ohio, Laurence E. Komp, Manchester, Missouri, Karl Schwartz, LAW OFFICE OF KARL SCHWARTZ, Elkins, Pennsylvania, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

　　　SILER, J., delivered the opinion of the court in which GIBBONS, J., joined. MOORE, J. (pp. 18–33), delivered a separate dissenting opinion.

---

**OPINION**

---

SILER, Circuit Judge.  Edward Lang, an Ohio prisoner under a death sentence, appeals from the district court's denial of his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254.  The district court granted Lang a Certificate of Appealability (COA) on his first and second grounds for relief, and we granted an expansion of the COA to include three additional claims.[1]  These claims can be reduced to two main issues.  The first involves a juror who was related through marriage to one of the victims of the homicide, whom the trial court removed from the jury prior to deliberations.  The second concerns the nature and volume of mitigation evidence presented by Lang's defense counsel.  For the reasons that follow, we **AFFIRM** the denial of relief by the district court.

## I.  Factual Overview

In 2006, Lang shot and killed Jaron Burditte and Marnell Cheek during a botched drug deal turned robbery in Canton, Ohio.[2]  Lang was indicted on two counts of aggravated murder and one count of aggravated robbery with firearm specifications.  In 2007, the case was tried before a jury.

### Juror 386

After the jury had been empaneled and the first two witnesses had testified, the prosecutor notified the trial court that Cheek's father recognized Juror 386 as the daughter of the woman married to Cheek's brother.  The trial court decided to address the issue at the next break, after two more witnesses testified.  The court later noted that, because the jurors were in the courtroom, they did not have the opportunity to interact with each other.  During the break, the trial court and counsel questioned Juror 386 outside the presence of the other jurors.  Juror 386

---

[1]However, Lang did not brief one of the claims certified for appeal: the ineffective assistance of appellate counsel.  Therefore, this claim is waived.  *See Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).

[2]Additional information about the facts underlying the crime can be found in the Ohio Supreme Court's opinion affirming Lang's conviction on direct appeal.  *State v. Lang*, 954 N.E.2d 596 (2011).

acknowledged her connection to Cheek and said she had met her once and had attended her funeral. The juror said she learned of Cheek's death from her grandfather and from what she had read in the newspaper; however, she denied talking to her mother, step-father, or family members about the case or learning anything about it. The trial court also questioned Juror 386 about her contact with the other jurors. She denied telling any of them about her connection to Cheek. Juror 386 was excused by agreement of the parties.

Before dismissing her, the trial court confirmed that Juror 386 had not spoken with other jurors and instructed her to have no contact with other jurors:

> **Trial Court:** You cannot discuss this at all with any of the other jurors. You have not done so. Is that correct?
>
> **Juror 386:** No.
>
> **Trial Court:** No? You cannot discuss this with them. You cannot call them on the phone and talk to them about this. If you would see them on the street or at a store while this case is still going on, you can't discuss with them why you were removed from jury service or anything else about this case whatsoever. Do you understand that?
>
> **Juror 386:** Yes.
>
> **Trial Court:** Have you talked to any of them about this whatsoever up until this very moment? Have you talked to any of the other jurors about this at all?
>
> **Juror 386:** No.
>
> **Trial Court:** Okay thank you.

The trial court then summoned the jurors and told them that Juror 386 was excused because "it was determined that she may have had a relationship with either a witness or a party or somebody that was involved in the case." The trial court asked the jurors as a group whether Juror 386 had talked to them about knowing someone involved in the case. The judge stated: "I take it by your silence that she did not." Neither Lang's counsel nor the prosecutor asked to question the jurors individually. Juror 386 was replaced, and the trial resumed. *State v. Lang*, 954 N.E.2d at 613. Lang does not claim a motion for a mistrial was made. When the prosecution rested, Lang presented no evidence. The jury returned a guilty verdict on all counts. Thereafter, the trial court held a separate hearing for mitigation evidence and sentencing.

**Mitigation Hearing**

At the mitigation hearing, the jury heard evidence, chiefly from Lang's mother and half-sister, about Lang's difficult and dysfunctional childhood. In his opening statement, Lang's defense counsel, Anthony Koukoutas, said, "I am not here to make excuses." He continued to say, "I want to show you that [Lang] [i]s not just a name on a case file or a name that appears in the newspaper, that he's an actual human being." Counsel then previewed what he expected Lang's mother, Tracie Carter, and Lang's half-sister, Yahnene Robinson, to testify. He emphasized Lang's father's negative qualities and how he abducted, abused, and neglected Lang. He also referred to evidence of Lang's psychiatric problems and the fact that Lang was severely withdrawn and emotionally scarred after living with his father for two years.

The Ohio Court of Appeals summarized Carter's and Robinson's testimony:

{¶ 315} Yahnena Robinson, the defendant's half-sister, had a close relationship with Lang before he was ten years old. She described it as a "typical brother sister relationship." Lang was also a "good student."

{¶ 316} Robinson testified that Lang's father, Edward Lang Sr., abused their mother and was on drugs. Their mother would not allow Edward to visit Lang very often because of "his history and his anger problems."

{¶ 317} After Lang graduated from elementary school, Lang visited his father in Delaware. The visit was supposed to last for two weeks, but Edward did not allow Lang to return home. Two years later, their mother found Lang and brought him home.

{¶ 318} Lang was happy when he first came home, but later, his mood changed. According to Robinson, "he would be sad sometimes, quiet * * * [and] other times he would look real hurt or be angry." Subsequently, Lang received counseling, went to a psychiatric facility, and spent time in a residential facility for his mental-health problems.

{¶ 319} Robinson also testified that Lang has a two-year-old daughter whose name is Kanela Lang.

{¶ 320} Tracy Carter, the defendant's mother, testified that Lang is the third of her four children. Carter met Edward Lang Sr. when he was her landlord. Carter did not have money to pay the rent, and she slept with him in exchange for lodging. Carter and Edward then developed a relationship.

{¶ 321} Carter stated that Edward became violently abusive when he was intoxicated and using drugs. After Lang was born, Edward went to jail for

stabbing Carter and setting her apartment on fire.  Edward was also incarcerated for child molestation.

{¶ 322} Carter would not allow Lang to visit his father until a court order ordered her to do so.  Carter lived in Baltimore, Maryland, and Edward lived in Delaware.  When he was ten years old, Lang went to see his father in Delaware for a two-week visit.  However, Edward did not allow Lang to return home after the two weeks ended, and Carter did not see her son for the next two years.  Carter made repeated attempts to find Lang in Delaware, but was unsuccessful. Finally, Carter found Lang and brought him home.

{¶ 323} Carter stated that her son was malnourished when she found him and was wearing the same clothing that he had been wearing when he left.  Lang also had a burn on his shoulder, a gash on his hand, and other bruises.  Lang told his mother that the burn was a cigarette burn.

{¶ 324} Before he saw his father, Lang had been treated with Depakote, Lithium, and Risperdal for depression and other conditions.  Carter made sure that he took these medications on a regular basis.  However, Lang did not continue to take them when he was with his father, because Edward did not obtain refills for the prescriptions.

{¶ 325} After returning home, Lang was withdrawn. Lang told Carter that he was fine and did not want to talk to her about what had happened.  But Carter learned from her son, Mendez, that Edward had sexually abused Lang.

{¶ 326} Lang has received extensive psychiatric and other treatment.  Carter testified, "He stayed in the Bridges Program twice for 90 days.  He stayed at Woodburn Respiratory [sic] Treatment Center for a year.  And he stayed off and on at * * * [the] Sheppard Pratt Center [a crisis center] 28 times."

{¶ 327} Lang has one child, Kanela. Carter states, "He has taken care of his daughter ever since the mother was pregnant. * * * [There] was nothing that he wouldn't do for her and for the baby."

{¶ 328} Lang did not finish high school.  He dropped out of the 11th grade and "went to take care of his baby's mother."  Lang got a job working for the census department.  In June 2006, Lang moved to Canton.

{¶ 329} As a final matter, Carter told the jury, "We all are suffering. * * * I never sat here and said my son was a perfect child.  I never sat here and said that my child had a good life or a bad life.  But I am asking you not to kill my child."

*Lang*, 954 N.E.2d at 643-44.

After Carter and Robinson testified, the prosecutor began his closing argument.  He attempted to minimize the testimony of Lang's mother and half-sister, stating, "We know now that Eddie was born in Baltimore, Maryland, that until the age of 10 life seemed to be pretty

good. From 10 to 12 his life was allegedly not so good." The prosecutor continued to discredit Lang's mitigation narrative, "[W]e know that his mother on numerous occasions sought help for Eddie, but Eddie didn't take his medication." In his charge to the jury, the prosecutor stated that the "aggravating circumstances that you found to exist beyond a reasonable doubt now outweigh those mitigating factors by that same burden."

In response, Koukoutas started his closing argument by reminding the jury of the seriousness of the death penalty. He returned to his theme that the jurors had learned about Lang as a person. "You learned that he had siblings, that what like the prosecutor said, pretty normal childhood up until he was ten." Koukoutas depicted Lang's mother in a relatively positive light, in contrast to Lang's abusive father. He asked the jury to consider how she was ashamed to testify that she had exchanged sex for rent to Lang's father—a drug user and a convicted child molester who beat her while she was pregnant with Lang. Koukatas said no one would ever know exactly what happened to Lang during the two years he was with his father, but he speculated that Lang's father may have "molested him or even pimped him out to get drugs." Koukoutas stressed the impact, both physical and psychological, on Lang of those two years when he was kept away from his mother. In conclusion, Lang's counsel acknowledged the loss to the victims' families, and he urged the jury to consider the consequences to Lang and his family.

## II. Procedural History

The jury deliberated for approximately eleven hours before recommending that Lang be sentenced to death for the aggravated murder of Cheek and to life imprisonment for the aggravated murder of Burditte. The trial court adopted this recommendation and sentenced Lang accordingly.[3] On direct appeal, Lang presented twenty-one propositions of law, arguing among other things: juror bias and ineffective assistance of counsel for failing to adequately prepare and present mitigation evidence. The Ohio Supreme Court affirmed Lang's convictions and sentence of death. *State v. Lang*, 954 N.E.2d 596 (Ohio 2011). Thereafter, Lang filed an application to

---

[3]The trial court also sentenced Lang to a ten-year term of imprisonment for the aggravated-robbery count and merged the gun specifications with an additional three-year term of imprisonment.

reopen his direct appeal under Ohio App. R. 26(B), alleging ineffective assistance of appellate counsel, but the Ohio Supreme Court denied this application in 2012.

In 2008, while his direct appeal was pending, Lang filed a state post-conviction petition, which raised fourteen claims, including several that alleged ineffective assistance of counsel at sentencing.  The trial court dismissed Lang's petition and denied his requests for discovery and an evidentiary hearing.  The Ohio Court of Appeals affirmed the trial court's denial of the post-conviction petition.  *State v. Lang*, No. 2009 CA 00187, 2010 WL 3314494 (Ohio Ct. App. Aug. 23, 2010).  The Ohio Supreme Court declined Lang's post-conviction appeal.  *State v. Lang*, 963 N.E.2d 824 (Ohio 2012).

In 2012, Lang filed a notice of intent to initiate the underlying federal habeas action. Lang's new counsel filed a 28 U.S.C. § 2254 petition, alleging seventeen grounds for relief.  In 2015, the district court denied Lang's habeas petition.  *Lang v. Bobby*, No. 5:12 CV 2923, 2014 WL 5393574, at *1 (N.D. Ohio Oct. 23, 2014).  The district court concluded that the decisions of the Ohio courts were neither contrary to, nor unreasonable applications of, clearly established federal law and were not unreasonable determinations of the facts.  However, the district court granted Lang a COA on Ground One, ineffective assistance of trial counsel regarding mitigating evidence, and Ground Two, juror bias.

We granted Lang an expansion of the COA to include three additional claims:  Ground Three, ineffective assistance of trial counsel based on counsel's failure to question individual jurors about their conversations with a biased juror; Ground Four, ineffective assistance of appellate counsel based on counsel's failure to raise claims of juror bias on direct appeal;[4] and Ground Fourteen, ineffective assistance of trial counsel based on trial counsel's characterization of Lang's childhood as "normal."  Therefore, the questions before us in this appeal are as follows:

---

[4]Because Lang did not brief Ground Four, he has waived any claim that his appellate counsel were ineffective when they failed to argue, on direct appeal, that trial counsel should have requested additional questioning of the jurors.

(1) Whether Lang's due process rights and rights to an unbiased jury were violated when a juror who was related to one of the victims was seated on the jury.

(2) Whether trial counsel were ineffective for failing to question individual jurors about their conversations with the allegedly biased juror.

(3) Whether Lang's trial counsel provided ineffective assistance by failing to adequately and properly investigate, develop, and present significant mitigation evidence.

(4) Whether Lang's trial counsel were ineffective for characterizing Lang's childhood as "normal."

## III. Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this case. *See Moreland v. Bradshaw*, 699 F.3d 908, 916 (6th Cir. 2012). Under AEDPA, a district court shall not grant a habeas petition on a claim that was decided on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Williams*, 529 U.S. at 412-13. Evidence introduced in federal court is not considered. *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). The petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *Hodges v. Colson*, 727 F.3d 517, 526 (6th Cir. 2013).

**IV. Juror Bias**

Lang first claims that his constitutional right to an unbiased jury was violated because Juror 386 was seated, albeit briefly. Lang argues that "Juror 386 never should have been on the jury or given the opportunity to taint Appellant's jury. The most basic disqualification of a juror occurs when the juror has a familial connection to the case." He contends that the trial court erred by failing to immediately remove Juror 386 and instead waiting for the next break in the trial, permitting two witnesses to testify in the interim. Lang also argues that his trial counsel was ineffective for failing to individually voir dire the other jurors after Juror 386 was removed.

Lang raised the juror bias claim and the related claim of ineffective assistance of trial counsel on direct appeal. The Ohio Supreme Court held that Juror 386's presence on the jury before being excused did not taint the jury because Juror 386 assured the trial court that she had not talked to any of the other jurors about her relationship to Cheek, and the other jurors indicated that they had had no conversations with her about the matter. *Lang*, 954 N.E.2d at 614. Citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982), and *Remmer v. United States*, 347 U.S. 227 (1954), the Ohio Supreme Court held that there was no prejudice to Lang and that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. *Lang*, 954 N.E.2d at 614. The trial court conducted a hearing in the presence of the prosecutor, defense counsel, and Lang; the trial court and both counsel questioned Juror 386; and neither the prosecutor nor Lang's counsel objected to the questioning or sought additional inquiry. *Id.* at 615. Under these circumstances, the Ohio Supreme Court concluded that no further inquiry was required. *Id*. The court also held that defense counsel's failure to request individual voir dire did not prejudice Lang. *Id.* at 631.

Lang's post-conviction petition did not include any claim related to Juror 386. However, in his federal habeas petition, Lang once again argued that his Sixth Amendment right to an impartial jury was violated by the presence of Juror 386. Likewise, he claimed his counsel was ineffective for failing to individually question the other jurors regarding Juror 386. The district court rejected these arguments, finding that the Ohio Supreme Court reasonably applied federal law in denying Lang's claim of juror bias. For the reasons that follow, we agree.

Under the standard established by the Supreme Court in *Remmer v. United States*, when there is evidence of possible juror bias, a defendant is entitled to a hearing with all interested parties present to determine the circumstances, the impact on the juror, and whether the information was prejudicial. 347 U.S. at 229-30. Subsequently, in *Smith v. Phillips*, the Court narrowed the *Remmer* standard to require that a petitioner show actual prejudice when alleging juror partiality. 455 U.S. at 217. In *Smith*, a habeas petitioner alleged that one of the jurors in his case applied for a job in the district attorney's office while serving on the jury. *Id.* at 213-14. The Supreme Court held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias," and that due process does not require a new trial whenever a juror is placed in a compromising situation. *Id.* at 215, 217.

In cases applying *Remmer* and *Smith*, the habeas petitioner bears the burden to demonstrate that a juror was biased. *See Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (Batchelder, C.J., concurring). Moreover, a juror's testimony at a *Remmer* hearing is not inherently suspect. *See Jackson v. Bradshaw*, 681 F.3d 753, 767 (6th Cir. 2012); *Zuern v. Tate*, 336 F.3d 478, 486 (6th Cir. 2003).

In *Phillips v. Bradshaw*, 607 F.3d 199 (6th Cir. 2010), jurors encountered a grand juror during a break, and the grand juror said something about Phillips's case. *Id.* at 222. The trial court questioned the jurors, and each one said that the grand juror's comments would not influence their decision. *Id.* at 223. The trial court accepted the jurors' assurances, the trial continued, and Phillips was convicted and sentenced to death. *Id.* at 204, 223. The Ohio Supreme Court affirmed the trial court's action under *Smith* and *Remmer*. *Id.* at 223. We denied habeas relief, holding that the petitioner provided no reason to view the jurors' assurances with suspicion and had not met his burden of demonstrating prejudice. *Id.*

> In reviewing claims of juror bias in the habeas context, we bear in mind that: (1) the trial court must hold a hearing when the defendant alleges unauthorized contact with a juror; (2) no presumption of prejudice arises from the unauthorized contact; (3) the defendant has the burden of proving actual juror bias; and (4) juror testimony at the *Remmer* hearing is not inherently suspect.

*Id.* (citing *Zuern*, 336 F.3d at 486).

Similarly, in *Carroll v. Renico*, 475 F.3d 708, 709 (6th Cir. 2007), a member of the petitioner's family threatened a juror, and another juror said a woman asked for her name. The trial court held a post-trial hearing and asked the two jurors whether the incidents affected the verdict. *Id.* Both jurors said no, and defense counsel did not ask any questions or request further investigation. *Id.* The Michigan Court of Appeals found that the jurors were not biased against the petitioner. *Id.* at 710. We held that *Remmer* and *Smith* do not require more than what the Michigan trial court did. *Id.* at 711-12. Likewise, in this case, the Ohio Supreme Court reasonably concluded that Juror 386's brief presence on the jury did not deny Lang's right to an impartial jury.

Nevertheless, Lang argues that he was entitled to relief under *McDonough Power Equipment v. Greenwood*, 464 U.S. 548 (1984). However, the district court correctly found *McDonough* to be inapplicable. *McDonough* was a products liability case involving a juror's failure to disclose information that would have supported a challenge for cause. *Id.* at 556. The jurors were asked about injuries to family members resulting in disability or prolonged pain and suffering. *Id.* After the verdict, one of the parties learned that a juror had failed to reveal that his son had suffered a broken leg when a tire exploded. *Id.* at 551. We held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. In this case, the Ohio Supreme Court made no finding of dishonesty or deliberate concealment; it determined only that Juror 386 "failed to disclose" her connection to Cheek. *Lang*, 594 N.E.2d at 614. Juror 386 did not participate in deliberations; thus the sole issue was Juror 386's possible extraneous influence on the jury. Accordingly, *Smith* and *Remmer*, not *McDonough*, represent the clearly established law that governs Lang's claim.

Lang also relies on *United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000), as support for his argument that the trial court conducted an inadequate *Remmer* hearing. In *Corrado*, defense counsel informed the district court that someone had approached the defendant and said that he had a friend on the jury who could help with the verdict. *Id.* at 533-34. The district court asked the jurors as a group whether anyone had tried to influence them and whether there was any

reason they could not continue to serve on the case. *Id.* at 534. The jurors were instructed to send the judge a note if the answer was yes. *Id.* No jurors submitted a note. *Id.* We held that the district court abused its discretion by failing to conduct an adequate *Remmer* hearing because a juror who was hesitant about coming forward could simply do nothing. *Id.* at 536. Yet Lang's case is distinguishable because it comes to the court on AEDPA review, rather than review for an abuse of discretion. Under AEDPA, the state court's findings are presumptively correct. *See Smith*, 455 U.S. at 218. Even if the trial court's actions would have been reversible error on direct federal court appeal, the Ohio Supreme Court's decision was not an unreasonable application of *Remmer*, *Smith*, and our cases interpreting those decisions.

In this case, the state court's rulings were not contrary to clearly established federal law. Once the trial court knew Juror 386's relationship to Cheek, it acted to prevent her from communicating with the other jurors and held a hearing to determine the effect of her presence on the jury. *See id.* at 217. Both prosecution and defense counsel participated in the hearing. *See Remmer*, 347 U.S. at 230. Juror 386 assured the court that she did not mention her relationship to the victim to the other members of the jury, and none of the jurors indicated that Juror 386 had talked to them about it. Neither Juror 386's testimony nor the other jurors' silence is inherently suspect. *See Smith*, 455 U.S. at 217. The burden was on Lang to show that a juror who decided his case was actually biased against him. *See id.* at 215; *Sheppard*, 657 F.3d at 348 (Batchelder, C.J., concurring). Juror 386 was removed from the jury well before deliberations, and Lang presented no evidence that the remaining jurors were tainted by Juror 386's connection with Cheek. *See* 28 U.S.C. § 2254(e)(1); *Smith*, 455 U.S. at 218.

Courts enjoy leeway when applying a general standard. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The standard established in *Remmer* and *Smith* provides enough leeway to conclude that the Ohio Supreme Court's decision was reasonable. Accordingly, we adopt the district court's finding that "the Ohio Supreme Court reasonably decided that the trial court's actions with regard to Juror 386 comported with due process."

Furthermore, because Lang's juror bias claim lacks merit, there is no merit to his related claim of ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that deficient

performance prejudiced the defense so as to deprive the petitioner of a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Lang alleged that his trial counsel should have requested individual voir dire of the other jurors regarding their possible discussions with Juror 386. The Ohio Supreme Court summarily rejected this claim, reasoning that even if it were to assume deficient performance by counsel, Lang suffered no prejudice. *Lang*, 954 N.E.2d at 631. The state court's decision was not contrary to or an unreasonable application of clearly established law. Accordingly, we affirm the district court's denial of Lang's habeas petition with respect to the alleged juror bias.

## V. Mitigation Evidence

Two claims of ineffective assistance of counsel at sentencing were certified for appeal. In Ground One of his habeas petition, Lang alleged that counsel failed to adequately and properly investigate, develop, and present significant mitigation evidence. In Ground Fourteen, he alleged that counsel was ineffective because, in closing argument to the jury, counsel characterized Lang's childhood up to age ten as "normal."

To prevail on these claims, Lang must do two things. First, he must establish a Sixth Amendment violation—that his lawyer performed well below the norm of competence in the profession and that this failing prejudiced his case. *Strickland*, 466 U.S. at 687. Second, he must satisfy AEDPA—by showing that any rulings by the Ohio courts on the merits of this claim were unreasonable. 28 U.S.C. § 2254(d). In federal habeas proceedings, the reviewing court looks to the last reasoned opinion addressing the claim at issue. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014). In this case, Lang raised essentially the same claims of ineffective assistance of trial counsel on direct appeal[5] and in his post-conviction proceedings. Because the Ohio Court of Appeals issued the last reasoned opinion on Lang's post-conviction claims, we begin by reviewing that decision.

---

[5]On direct appeal, the Ohio Supreme Court found that Lang's counsel thoroughly prepared for the penalty phase by hiring a mitigation expert, a psychologist, and a criminal investigator several months before trial and by requesting social service records. *Lang*, 954 N.E.2d at 638. The Ohio Supreme Court held that counsel's decision to rely solely on the testimony of Lang's mother and sister was a tactical choice and not ineffective assistance of counsel. *Id.* The court concluded that Lang's counsel were not ineffective, that he received a fair trial, and that any error was not prejudicial. *Id.* at 639.

The Ohio Court of Appeals affirmed the trial court's denial of Lang's post-conviction petition. *Lang*, 2010 WL 3314494, at *5. Shortly after Lang was indicted, his counsel requested discovery, moved for funds for an investigator, a psychological expert, and a mitigation expert, and filed over eighty-two motions. *Id.* at *3. Therefore, the Ohio Court of Appeals rejected Lang's argument that counsel waited until the last minute to gather mitigating evidence. *Id.* at *7-8. Holding that that counsel's strategy was to treat Lang's mother sympathetically, to humanize Lang, and to present his mental health issues in lay, rather than detailed, scientific terms, the Ohio Court of Appeals concluded that Lang's counsel performed reasonably in the mitigation phase. *Id.* at *8.

The state court also held that even if counsel's performance was deficient, Lang was not prejudiced by counsel's performance. The court found that Lang's mother and half-sister presented a detailed picture of his youth, mental health problems, and abuse by his father. *Id.* Summarizing Lang's additional, post-conviction evidence, the Ohio Court of Appeals recounted Lang's father's physical and sexual abuse of Lang's mother, Lang's brother's physical and sexual abuse of Lang and his sister, and Lang's father's sexual, physical, and emotional abuse of Lang. *Id.* at *6-7. The court also found that, after the two years spent with his father, Lang began using drugs, was admitted to a psychiatric hospital, and attempted suicide. *Id.* at *7. Moreover, Lang's mother abandoned him at times and did not ensure that he took his mood disorder medications. *Id.* Nonetheless, the Ohio Court of Appeals was unpersuaded that this "additional and more detailed evidence about the [Lang]'s upbringing and mental health issues would have created a reasonable probability that the jury would have recommended a life sentence, rather than the death penalty, for the Marnell Cheek killing." *Id.* at *9.

The district court agreed, holding that the Ohio Court of Appeals' denial of Lang's claims was not contrary to or an unreasonable application of *Strickland*. For the reasons articulated by the district court, we also find that the Ohio court reasonably determined that defense counsel's performance at the mitigation hearing was not ineffective.

As a threshold matter, Lang did not submit affidavits from his trial counsel, and both the post-conviction trial court and the district court denied Lang an evidentiary hearing. Thus, there is no direct evidence of Lang's trial counsel's mitigation strategy. However, invoices filed with

the trial court indicate that counsel began preparing for the mitigation hearing soon after taking Lang's case.  Counsel hired a mitigation investigator and a psychologist and spent several hundred hours preparing for trial.

Lang's post-conviction materials suggest that counsel either chose not to present or perhaps overlooked other evidence about Lang and his family, but there are reasonable strategic reasons for counsel to have chosen not to present these materials.  This additional evidence could have opened the door to evidence of bad character on cross-examination and rebuttal.  Reports from various social services agencies documented how Lang's mother neglected, abused, and abandoned Lang and his siblings.  A psychologist's expert report filed by Lang in his post-conviction materials indicated that Lang had no friends, threatened people, set fires, made improper sexual advances, was too violent to be placed in juvenile detention, and did not comply with mental health treatment.  Thus, counsel's choice to have only Lang's mother and sister testify at the mitigation hearing and to not call a psychologist may have been strategic.

There is a strong presumption that an attorney's attention to some issues at the exclusion of others reflects tactics rather than neglect. *See Yarborough*, 540 U.S. at 8.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.  Here, it was reasonable for counsel to limit mitigation testimony to Lang's mother and half-sister and avoid the risk of negative information about Lang's behavior and criminal history.  *See id.* at 699 (holding counsel did not perform deficiently by limiting testimony about Washington's character because it ensured that contrary character evidence and criminal history would not come in).  Applying *Strickland*, we have held that counsel enjoy wide latitude in strategic decision-making on issues of mitigation evidence. *See Hartman v. Bagley*, 492 F.3d 347, 358-61 (6th Cir. 2007).  In *Hartman*, we found no deficient performance when defense counsel chose to offer mitigating evidence through the testimony of Hartman's relatives rather than a psychologist who identified mitigating circumstances but who also would have presented arguably damaging evidence. *Id.*; *see also Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005) (finding no deficient performance in

counsel's decision not to present the testimony of a psychologist who would have testified that the petitioner was impulsive, had poor judgment, low behavior control, anger, and harmful emotional attachments).

Moreover, Lang bears the burden of proof to show that his counsel made decisions without adequate knowledge. *See Strickland*, 466 U.S. at 687; *Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) (holding that there was no basis to find that counsel's performance was deficient because the petitioner did not provide any statement from trial counsel describing what he did or did not do). Here, there was no direct evidence of defense counsel's strategy or choices. The opening statement and closing argument support the Ohio Court of Appeals' theory that counsel wanted to humanize Lang and avoid presenting him and his mother in a bad light. Lang's post-conviction submissions show that there was more evidence available about his background, both potentially helpful and potentially harmful, than counsel presented. But Lang did not prove that his trial counsel overlooked this evidence, and he did not rebut the presumption that counsel acted strategically. Courts may not "insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington*, 562 U.S. at 109.

As we recently held in *Caudill v. Conover*, 881 F.3d 454, 462 (6th Cir. 2018), a defense lawyer has no constitutional obligation to present cumulative evidence at a mitigation hearing. In that case, counsel had no duty "to identify and interview distant relatives, former childhood neighbors, past boyfriends, and acquaintances who would provide similar information." *Id.* (citing *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)). "There comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, 558 U.S. at 11. In *Van Hook*, the Supreme Court reversed our circuit and held that there was nothing wrong with the lawyer's decision not to seek more mitigation evidence about the defendant's background than he already had. *Id.* at 11-12. Having already unearthed evidence "from those closest to Van Hook's upbringing and the experts who reviewed his history," the lawyer was under no duty to "identify and interview every other living family member or every therapist." *Id.* at 11. The same conclusion applies here—and doubly so because AEDPA deference applies. Lang's counsel reasonably could conclude that calling a psychologist or introducing volumes of records from

Baltimore Social Services might undermine Lang's case. We presume the reasonableness of such strategic decisions. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

Finally, we turn to Lang's argument that his counsel performed both deficiently and prejudicially when, during closing argument, he mischaracterized Lang's early childhood as "normal." Lang argues that "[a] childhood filled with horrific abuse and violence is not normal." We do not dispute this. As the post-conviction evidence revealed, Lang's childhood prior to age ten was anything but normal. However, Lang's mitigation evidence centered on Lang's experiences at the hands of his father who, as Lang's mother testified, was absent until Lang was ten years old. Lang's counsel echoed the prosecutor's characterization of Lang's early life as "normal" presumably to avoid blaming Lang's mother—his primary mitigation witness—for his client's difficulties. Therefore, the Ohio Supreme Court reasonably concluded that counsel's approach did not result in ineffective assistance of counsel because it "allowed the defense to focus the jury's attention on defense counsel's argument that addressed Lang's abuse after his father abducted him." *Lang*, 954 N.E.2d at 639. Based on the evidence before the state court, it cannot be said that its application of *Strickland* was objectively unreasonable. *See Yarborough*, 540 U.S. at 5.

For the foregoing reasons, the district court's denial of Lang's petition for a writ of habeas corpus is **AFFIRMED**.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.   Because I believe that Lang's constitutional right to an unbiased jury was violated and also that he has established his two ineffective-assistance-of-counsel claims arising out of the mitigation phase of his trial, I respectfully dissent from the majority's denial of relief to Lang on Grounds One, Two, and Fourteen.

## I.  STANDARD OF REVIEW

Lang's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   Under AEDPA, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim on the merits was:   (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

## II.  JUROR BIAS

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."   U.S. Const. amend. VI.   This right is applicable to the states via the Fourteenth Amendment.   *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992).   Furthermore, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."   *Id.* at 727.

Lang argues that his constitutional right to an unbiased jury was violated when the victim Marnell Cheek's niece by marriage was seated on his jury.   I agree.

## A.  Juror 386

On the morning of the second day of trial, defense counsel informed the court that Juror 386 had been observed nodding and smiling to individuals in the public gallery.   R. 22-2 (App'x

Vol. 28 at 517) (Page ID #7352).   In response, the prosecutor stated that Marnell Cheek's father had approached him and revealed that Juror 386 was Cheek's niece by marriage.  *Id.* at 517–18 (Page ID #7352–53).   The trial court said that it would investigate this issue at the next break. *Id.* at 518 (Page ID #7353).

When questioned, Juror 386 confirmed that the victim Marnell Cheek was her step-father's sister.  *Id.* at 593 (Page ID #7428).   Juror 386 claimed that she had not discussed the case with anyone and that the only information she had about the case was what she had read in the newspaper.  *Id.* at 594, 598 (Page ID #7429, 7433).   However, Juror 386 admitted that she had learned of her aunt's death from her grandfather and that she had attended her aunt's viewing and funeral with her step-father.  *Id.* at 596–99 (Page ID #7431–34).   She also admitted that she had failed to disclose this information to the court.  *Id.* at 593 (Page ID #7428); *see also* R. 22-1 (App'x Vol. 27 at 227–39) (Page ID #6551–63) (portion of voir dire in which the court asked the prospective jurors about any connections to the criminal justice system, including whether they knew a victim of a crime, and Juror 386 remained silent); R. 55-1 (Juror Questionnaires Part 1a at 99–109) (Page ID #10969–79) (Juror 386's questionnaire in which she stated that no relative had ever been a victim of a crime, she had no personal knowledge of Cheek's death, and she had not discussed Cheek's death with anyone).   Juror 386 did deny discussing her relationship to Cheek with the other jurors.  R. 22-2 (App'x Vol. 28 at 597–98) (Page ID #7432–33).

At this point, the prosecutor moved to remove Juror 386 for cause, and defense counsel agreed.  *Id.* at 601 (Page ID #7436).   The trial court removed Juror 386 from the jury panel, *id.* at 603 (Page ID #7438), and proceeded to question the remaining jurors as a group, *id.* at 605 (Page ID #7440).   The court first informed the jurors that Juror 386 "may have had a relative relationship with either a witness or a party or somebody that was involved in the case."  *Id.* at 606 (Page ID #7441).   Next, the court asked the jurors as a group whether Juror 386 had discussed her relationship with someone involved in the case with any of them; the court stated that "I will take your silence if none did."  *Id.*   All the jurors remained silent and the court then proceeded with the trial.  *Id.*

**B. Inadequate *Remmer* Hearing**

Lang raised his claim for relief predicated on Juror 386 on direct appeal in front of the Supreme Court of Ohio. *State v. Lang*, 954 N.E.2d 596, 613 (Ohio 2011). The state court found that Juror 386 had failed to mention her familial relationship to victim Cheek both in her juror questionnaire and during voir dire. *Id.* But the Supreme Court of Ohio rejected Lang's claim of bias as "speculative and unsupported by the evidence." *Id.* at 614. Furthermore, the court held that the trial court had properly conducted a *Remmer* hearing. *Id.* at 614–15. On federal habeas review, the district court concluded that the state-court decision reasonably applied federal law and thus denied Lang's claim, but it granted a Certificate of Appealability ("COA") with respect to this claim. R. 56 (Dist. Ct. Op. at 74, 121) (Page ID #13159, 13206).

Lang argues that the Supreme Court of Ohio unreasonably applied *Remmer v. United States*, 347 U.S. 227 (1954), when it concluded that the trial court had conducted an adequate *Remmer* hearing. Appellant Br. at 17–19.[1] In *Remmer*, the Supreme Court held that a trial court, when faced with a claim of jury bias, "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." 347 U.S. at 230. At a *Remmer* hearing, the defendant has the burden of proving actual bias. *Smith v. Phillips*, 455 U.S. 209, 215 (1982).

The trial court's inquiry into juror bias in this case was less than minimal. The court asked the remaining jurors as a group one question—had Juror 386 discussed a potential relationship with someone involved in the case with them—and took silence as a no. R. 22-2 (App'x Vol. 28 at 606) (Page ID #7438). This question was overly narrow because it focused only on whether Juror 386 had revealed her relationship to Cheek to her fellow jurors, and not on whether Juror 386 had tainted the remaining jurors' ability to be impartial through other biased comments. Furthermore, if a juror were hesitant, being forced to speak up in front of the rest of the jury panel would have a depressing effect on his or her ability or willingness to be forthcoming. Certainly, as the majority admits, Maj. Op. at 12, if this case were before us on

---

[1]Lang makes other arguments with respect to this claim, Appellant Br. at 19–20, but I agree with the majority that these arguments are inapposite, Maj. Op. at 11.

direct review, our precedent compels us to conclude that this one-question hearing was constitutionally inadequate. *United States v. Corrado*, 227 F.3d 528, 535–36 (6th Cir. 2000). But even viewed through the deferential lens of AEDPA review, the Supreme Court of Ohio's conclusion that this minimal inquiry satisfied due process is an unreasonable application of clearly established federal law.

The majority looks to *Carroll v. Renico,* 475 F.3d 708 (6th Cir. 2007), and states that "*Remmer* and *Smith* do not require more than what the Michigan trial court did." Maj. Op. at 11. True that may be, but the Michigan trial court in *Carroll* did significantly more investigation than what occurred here. In *Carroll*, "the trial court received a note from the jury that family members of one of the defendants harassed two jurors." 475 F.3d at 709. The trial court "heard these two jurors' stories, [and] the trial judge assured the jury that deputies would protect them." *Id.* The note described the harassment in some detail. *Id.* After the jury convicted Carroll, "the trial judge asked the two jurors whether earlier events affected the verdict. Both jurors said that the earlier events did not affect their decisions as to defendants' guilt." *Id.* Thus, the trial court in *Carroll* had a detailed description of the potential extraneous influence on the jurors and received affirmative responses from the two jurors who had been exposed to this potential taint that they had remained impartial decisionmakers.

*Phillips v. Bradshaw*, 607 F.3d 199 (6th Cir. 2010), is similarly distinguishable. Maj. Op. at 10. The petit jurors in Phillips's trial had encountered a member of the grand jury who had made a comment about the case. *Phillips*, 607 F.3d at 222. In response, the trial court held a hearing at which "the court and both counsel questioned all of the jurors" and the grand juror. *Id.* at 223. This hearing elicited testimony about the jurors' actions following the remarks made by the grand juror and the jurors' assurances "that they could be fair and impartial arbiters." *Id.* at 222–23. Thus, the trial court in *Phillips* undertook a far more detailed investigation into potential juror bias than the inquiry in the case at bar, because it examined both the scope of the impermissible extraneous information and its potential impact.

The investigations in *Carroll* and *Phillips* varied in degree and kind from what occurred in this case. A sufficient investigation into potential juror bias must proceed along multiple dependent axes. A trial court cannot determine the prejudicial impact of potential extraneous

influence upon a juror until it discovers all the means by which that extraneous influence may have touched the juror. It would be akin to a doctor trying to determine if a patient had caught an infectious disease from an afflicted acquaintance by asking only if the patient had shared a drink with that person, and not determining whether the two individuals had other interactions through which the disease could be communicated. Here, the trial court's one question directed to the entire panel did not sufficiently determine the potential scope of the extraneous influence on the remaining jurors, because it was such a limited question. Juror 386 may not have mentioned her relationship to the victim Cheek, but she could have made other prejudicial comments. The remaining jurors were not even aware to whom Juror 386 was related, so may not have realized that any other comments she may have made were inappropriate. The remaining jurors' silence to the trial court's one question leaves us unable to determine anything about the true extent of Juror 386's prejudicial impact. Therefore, the trial court could not have sufficiently investigated the effect of the tainted Juror 386 on the remaining jurors' ability to remain impartial.

The *Remmer* hearings in *Carroll* and *Phillips* may have satisfied the Supreme Court's requirement that a trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate," *Remmer*, 347 U.S. at 230, but the trial court's inquiry in Lang's case into the potential bias caused by having his victim's niece by marriage empaneled on his jury and serving for a day on the jury before being excused falls far below this minimum threshold. I believe, therefore, that the Supreme Court of Ohio unreasonably determined that the trial court's one-question "hearing" was sufficient, because the one question asked was erroneously focused on only one means by which Juror 386 could have biased the jury. It was thus unreasonable to conclude that this one-question "hearing" could determine the potential prejudicial impact on the remaining jurors as required by *Remmer*.[2]

---

[2]The majority also states that the trial court could reasonably rely on the testimony of Juror 386 that she did not mention her relationship to Cheek to her fellow jurors because her testimony was not "inherently suspect." Maj. Op. at 12. This statement strains credulity. Certainly, the Supreme Court has stated that the testimony of a juror at a *Remmer* hearing is not "inherently suspect." *Smith*, 455 U.S. at 217 n.7. But it did so on the basis that "one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.* (internal quotation marks omitted). Juror 386 forfeited this presumption of credibility when

Furthermore, to the extent that the Supreme Court of Ohio deemed the one-question hearing sufficient under *Remmer* because "[n]either the state nor the defense counsel objected to the questioning or requested an additional inquiry," *Lang*, 954 N.E.2d at 615, this was an unreasonable application of clearly established federal law, as the Supreme Court has held that the trial court has an independent duty to ensure an impartial jury and conduct an adequate *Remmer* hearing if required. *Smith*, 455 U.S. at 217 ("Due process means . . . a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). Consequently, I respectfully dissent from the majority's denial of Lang's first claim for relief. Lang is entitled to a new trial with an impartial jury.

### III. MITIGATION PHASE

The mitigation phase of a capital case is premised on "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Foust v. Houk*, 655 F.3d 524, 534–36 (6th Cir. 2011) (omission in original) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)). Or, in other words, sometimes "[t]hose to whom evil is done [d]o evil in return." *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008) (alterations in original) (quoting W.H. Auden, "September 1, 1939").

Before this court, Lang asserts two claims arising from the mitigation phase of his trial: (1) ineffective assistance of counsel due to the failure properly to investigate, develop, and present mitigation evidence; and (2) ineffective assistance of trial counsel based on the characterization of Lang's childhood as "normal." Lang presented both these ineffective-assistance-of-counsel claims to an Ohio state court. *Lang*, 954 N.E.2d at 638–39; *State v. Lang*, No. 2009 CA 00187, 2010 WL 3314494, at *7–9 (Ohio Ct. App. Aug. 23, 2010). Pursuant to AEDPA, "we review the last state-court decision to reach the merits of the particular claims being considered." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc). In this case, the

---

she actively concealed her relationship to Cheek until she was confronted by the trial court. R. 22-2 (App'x Vol. 28 at 593) (Page ID #7428); *see also* R. 22-1 (App'x Vol. 27 at 227–39) (Page ID #6551–63); R. 55-1 (Juror Questionnaires Part 1a at 99–109) (Page ID #10969–79).

last state-court decision to adjudicate Lang's claim that his trial counsel ineffectively investigated and presented mitigation evidence was the Fifth District Court of Appeals in its affirmance of the denial of Lang's petition for post-conviction relief. *Lang*, No. 2009 CA 00187, 2010 WL 3314494. The Supreme Court of Ohio was the last state court to adjudicate Lang's claim that his counsel was ineffective in characterizing his childhood as "normal." *Lang*, 954 N.E.2d at 638–39. The majority rejects both of Lang's ineffective-assistance-of-counsel claims arising from the mitigation phase of Lang's trial. Maj. Op. at 16–17. I respectfully dissent.

## A. The Standard for An Ineffective-Assistance-of-Counsel Claim

To prevail on an ineffective-assistance claim, Lang must meet the two-pronged standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), and show that: "(1) [his] counsel's performance was deficient, or put differently, 'fell below an objective standard of reasonableness'; and (2) the performance prejudiced [Lang]." *United States v. Mahbub*, 818 F.3d 213, 230–31 (6th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). "Because the *Strickland* standard is already 'highly deferential,' our review of a state-court decision on a *Strickland* claim is 'doubly deferential' under" AEDPA. *King v. Westbrooks*, 847 F.3d 788, 795 (6th Cir. 2017) (citations omitted). In other words, this court "take[s] a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quotation marks omitted). But this double deference does not fully apply when a state court adjudicated an ineffective assistance claim on only one prong of *Strickland*: "The unadjudicated prong is reviewed de novo." *King*, 847 F.3d at 795 (quoting *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012)).

## B. The Mitigation Phase

At the mitigation phase of Lang's trial, his trial counsel called Lang's half-sister and his mother as mitigation witnesses. R. 22-3 (App'x Vol. 29 at 339–71) (Page ID #8015–47). His half-sister, Yahnena Robinson, testified that Lang's father, known as Coffee, abused their mother and was a drug addict. *Id.* at 341 (Page ID #8017). She described her relationship with her brother as "close" and said that they "had a typical brother sister relationship" before Lang was

ten years old. *Id.* Robinson then explained that when Lang was ten, he went to visit his father in Delaware for what was supposed to be a two-week visit. *Id.* at 342–43 (Page ID #8018–19). According to Robinson, it took her mother two years to recover her son and during that time Robinson had no contact with her brother. *Id.* at 343–44 (Page ID #8019–20). After their mother found Lang and brought him back to Maryland, Robinson described Lang's emotional state as noticeably different. *Id.* at 344–45 (Page ID #8020–21).

After Robinson testified, Lang's trial counsel called Lang's mother, Tracy Carter. *Id.* at 348 (Page ID #8024). She told the jury that she met Coffee when she was eighteen; he was her landlord and, because she was a single, teenage mother with no money, she traded sex for free rent. *Id.* at 349 (Page ID #8025). Carter testified that Coffee was a violent drug addict. *Id.* at 349–50 (Page ID #8025–26). According to Carter, Coffee was around for some period of time after Lang was born, but he did not reconnect with his son until Lang was ten. *Id.* at 350 (Page ID #8026). In the interim, Coffee was incarcerated for setting Carter's apartment on fire, raping Carter, and molesting a child. *Id.* When Lang was ten, his father gained court-ordered visitation rights. *Id.* at 351 (Page ID #8027). Carter testified that Lang was supposed to visit his father for two weeks in Delaware, but Coffee kept Lang from Carter for two years. *Id.* at 351–55 (Page ID #8027–31). When Carter was finally reunited with Lang, he was wearing the same clothes and shoes he had worn when he left her two years prior and weighed less than ninety pounds. *Id.* at 355 (Page ID #8031). Lang had a cigarette burn on his shoulder, a gash on his hand, and bruises on his body. *Id.* at 356 (Page ID #8032). Furthermore, his emotional problems—which he had suffered from prior to this period—were exacerbated, and Carter testified that Lang visited a psychiatric facility twenty-eight times, including multiple times as an inpatient, during his childhood. *Id.* at 356–60 (Page ID #8032–36). Carter suspected that Coffee had sexually abused Lang, but testified that Lang had never admitted this to her. *Id.* at 361–61 (Page ID #8037–38).

Although Lang's mother and sister painted a fairly dire picture of Lang's childhood, their testimony did not accurately portray the extraordinary extent of the abuse and deprivation Lang endured as a child. In its decision on Lang's post-conviction appeal, the Ohio Court of Appeals summarized much of the mitigation evidence not presented by Lang's trial counsel. *Lang*, No. 2009 CA 00187, 2010 WL 3314494, at *6–*7. Contrary to the testimony presented and the

arguments made at the mitigation phase, Coffee had substantial interactions with his son during Lang's early years.  Coffee sexually and physically abused Lang when he was a toddler.  *Id.* at *6.  "During that same time period, appellant and his siblings also 'witnessed Coffee tying their mother up [for] 3–4 days, ordering her to perform fellatio, stabbing her in [the] chest with a pair of scissors, shooting her in the back of her leg, shooting windows out, cursing at her, beating her up, and attempting to set the house on fire with them in it.'"  *Id.* (alterations in original).  Lang and his siblings also "witnessed Coffee raping [their mother] on several occasions."  *Id.* (alteration in original) (internal quotation marks omitted).

Furthermore, trial counsel did not develop the facts of Lang's abduction by Coffee during Carter's testimony.  "During the time [Lang] lived with his father, he endured physical, sexual, and emotional abuse.  [Lang] was forced to stay in his bedroom for days at a time, and he was repeatedly beaten with anything in reach.  In addition to enduring the physical abuse, [Lang] was falsely told by Coffee that his mother was dead.  [Lang], at this young age, began using drugs." *Id.* (internal citations and quotation marks omitted).

Trial counsel also failed to present evidence that Lang's older brother physically and sexually abused Lang and his sister, Robinson.  Lang's brother hit Lang in the head with a baseball bat, and "acted out sexually towards [Lang and his sister], ordering them to perform oral sex on him."  *Id*.  Lastly, Lang's trial counsel did not present to the jury evidence that Carter frequently abandoned Lang and his siblings, leaving her children to care for themselves.  *Id.* at *6.

## C.  Ineffective Investigation, Development, and Presentation of Mitigation Evidence

Lang first argues that his trial counsel's investigation, development, and presentation of mitigation investigation was constitutionally inadequate.  I agree.

Trial counsel began preparing for the mitigation phase in December 2006, requesting funds for a private investigator, psychological expert, and defense mitigation expert.  R. 17–1 (App'x Vol. 1 at 1–23) (Page ID #195–217).  However, the record shows that trial counsel did not obtain much of the corroborating documentary mitigation evidence until too late.  On July 9, 2007, the expert psychologist sent a fax to trial counsel inquiring whether they had obtained

Lang's records yet.  R. 19–3 (App'x Vol. 13 at 69) (Page ID #2852) ("No Lang records yet, I gather . . . ???" (ellipses in original)).  The record indicates that the psychologist did not receive the relevant records until the day after the mitigation phase, when the jury had already recommended that Lang be executed for the murder of Cheek.  *Id.* at 70 (Page ID #2853).  Additionally, the private investigator for the defense received only three-quarters of Lang's foster care records less than a week before the mitigation phase and it appears he may not have received the remaining records prior to the hearing.  *Id.* at 68 (Page ID #2851).  The investigation and preparation of mitigation witnesses was similarly sparse.  His mother Carter—the supposed lynchpin of the mitigation strategy—had one twenty-five minute meeting with the mitigation specialist less than ten days before trial and met substantively with trial counsel only once:  the day before she testified.  R. 18-4 (App'x Vol. 9 at 98) (Page ID #2451).  Despite these deficiencies, trial counsel repeatedly represented to the trial court that the investigation into mitigation evidence was proceeding or had proceeded smoothly.  R. 22-1 (App'x Vol. 27 at 124) (Page ID #6448); R. 22-3 (App'x Vol. 29 at 378) (Page ID #8054); *see also* R. 22-1 (App'x Vol. 27 at 92) (Page ID #6416).

As the majority recognizes, "Lang's post-conviction materials suggest that counsel either chose not to present or perhaps overlooked other evidence about Lang and his family."  Maj. Op. at 15.  Either possibility leads to the conclusion that the performance of Lang's trial counsel during the mitigation phase was constitutionally deficient.

First, to the extent the record demonstrates that trial counsel "overlooked other evidence about Lang and his childhood," this constitutes constitutionally inadequate performance.  The Supreme Court has relied on the American Bar Association's Guidelines on death-penalty representation in order to determine what constitutes objectively reasonable performance.  *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).  Under this professional standard, "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  *Id.* (emphasis in original) (quoting Am. Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)); *see also* Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death

Penalty Cases 10.11 (rev. ed. 2003). Here, trial counsel spent minimal time interviewing and preparing a key mitigation witness, and they failed to ensure that significant mitigation evidence arrived in time. Merely ordering Lang's childhood records is an insufficient investigation. *See Sears v. Upton*, 561 U.S. 945, 946 (2010); *Wiggins*, 539 U.S. at 524–25; *Terry Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Foust*, 655 F.3d at 534–36; *Johnson*, 544 F.3d at 599–602.

Second, if trial counsel's decision to present an incomplete picture of Lang's childhood is justified as strategic, Maj. Op. at 15, it can only be done so if it was a reasoned decision based on a complete investigation. *Terry Williams*, 529 U.S. 362, 396 (2000) ("[T]he failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision . . . [Instead, these omissions] clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."). "Buttressed by a reasonably adequate investigation, the defense team's ultimate presentation to the jury might have been justified as the product of strategic choice. But that is not what happened." *Johnson*, 544 F.3d at 603 (citing *Wiggins*, 539 U.S. at 536).

Even if trial counsel's choice to present such a minimal description of Lang's life was an informed decision based on an adequate investigation, the Ohio Court of Appeals' rationalization of the trial counsel's strategy is insufficient. *Harrington v. Richter*, 562 U.S. 86, 109 (2011) ("[C]ourts may not indulge post hoc rationalization for counsel's decisonmaking that contradicts the available evidence of counsel's actions . . . ." (internal citation and quotation marks omitted)). The Ohio Court of Appeals concluded that trial counsel's minimal presentation was based on the strategic choice to focus the witnesses' testimony on Lang's abduction by his father, to the exclusion of other traumatic events Lang experienced in his life. *Lang*, No. 2009 CA 00187, 2010 WL 3314494, at *8–*9. The state court reasoned that any additional information that could have been presented had the capacity for undermining the credibility of Lang's mother, as she was partially responsible for his traumatic childhood, or for being overly technical and thus harming the "humaniz[ing]" strategy undertaken by Lang's counsel. *Id.* at *8. Additionally, the state court concluded that, even if Lang's counsel should have presented this additional mitigation evidence, there was no prejudice to Lang because it would have been cumulative. *Id.* at *9.

Lang's counsel failed to present any evidence that Lang was a witness to and a victim of Coffee's physical and sexual violence from a very young age, as well as evidence that Lang's older brother physically and sexually abused him. *Lang*, No. 2009 CA 00187, 2010 WL 3314494, at *6–*7. The state court's conclusion that trial counsel was not constitutionally ineffective for failing to present this key mitigation evidence because of strategy is unreasonable: this evidence would not have undermined Lang's mother's credibility[3] or failed to "humanize" Lang because it was overly technical. *See Terry Williams*, 529 U.S. at 396 ("[T]he failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession.").

Furthermore, the state court's holding that the failure to present this evidence was not prejudicial is an unreasonable application of clearly established federal law. The state court held that because the omitted evidence was merely "additional and more detailed," it would not have "created a reasonable probability that the jury would have recommended a life sentence." *Lang*, No. 2009 CA 00187, 2010 WL 3314494, at *9. First, the state court's articulation of what constitutes constitutional prejudice is incorrect. When a habeas petitioner is arguing that the presentation of mitigation evidence during the penalty phase of a capital case was prejudicial, the question is whether "there is a reasonable probability that at least *one juror* would have struck a different balance." *Wiggins*, 539 U.S. at 537 (emphasis added). This standard does not require Lang to demonstrate that all of the jurors would have come to a different conclusion.

Second, the state court's characterization of the omitted evidence as cumulative is unreasonable. Lang's trial counsel failed at the mitigation phase to present any evidence of the sexual and physical abuse of Lang starting from when he was a toddler at the hands of both his father and brother. Thus, any evidence about this abuse could not have been cumulative. *See Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008) ("In short, rather than being cumulative, this

---

[3]The majority implies that if Lang's trial counsel had presented evidence of Lang's childhood trauma prior to his abduction, this would have harmed his mother's credibility as a mitigation witness. Maj. Op. at 16. This conclusion is puzzling. If Carter's credibility was not impugned by her failure to protect Lang from Coffee's abduction and rescue him, why would her credibility be hurt by her failure to protect Lang from the repeated physical and mental trauma to which he was exposed prior to his abduction? Alternatively, if the concern is that the jury would blame Carter for Coffee's abuse of Lang, then this potential opprobrium was already triggered by introducing some evidence of the abuse.

evidence provides a more nuanced understanding of Jells's psychological background and presents a more sympathetic picture of Jells."). Furthermore, this kind of evidence is critically relevant during the mitigation phase of a capital case.**[4]** *Wiggins*, 539 U.S. at 535; *see also Foust*, 655 F.3d at 534; *Johnson*, 544 F.3d at 605.

Consequently, there is a reasonable probability that a juror—especially one sitting on a jury that had recommended life imprisonment and not death for the murder of the other victim, Jaron Burditte—would have weighed the mitigation evidence differently if he or she had heard the true nature and extent of the deprivations of Lang's childhood.**[5]** *Cf. Sears*, 561 U.S. at 954 (holding that the prejudice inquiry under *Strickland* is not limited to cases in which there was no or minimal mitigation evidence presented, but that there can be "deficiency *and* prejudice" when "counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase"). Even with the doubly-deferential standard of AEDPA and *Strickland*, the failure of Lang's counsel to present critically relevant evidence about his early childhood violated Lang's right to constitutionally effective counsel. This failure could not have been the product of sound trial strategy, and there is a reasonable probability that one juror would have reached a different decision if he or she had heard this evidence. Thus, I respectfully dissent from the majority's conclusion to the contrary.

### D.  Ineffective Closing Argument at the Mitigation Phase

During the closing argument of the mitigation phase, Lang's counsel described Lang's childhood as "pretty normal . . . up until he was ten." R. 22-3 (App'x Vol. 29 at 389) (Page ID #8065). Lang argues that, by making this statement, his trial counsel was constitutionally ineffective because they misrepresented the evidence. Appellant Br. at 53. On direct review, the Supreme Court of Ohio held that this statement was not a misrepresentation of the evidence and that it "maintained defense credibility and allowed the defense to focus the jury's attention on defense counsel's argument that addressed Lang's abuse after his father abducted him." *Lang*,

---

**[4]**That some of this evidence may have opened the door to the state's introduction of adverse evidence in response does not alter this conclusion. *See Harries v. Bell*, 417 F.3d 631, 641 (6th Cir. 2005).

**[5]**The prejudice arising from the failure to introduce this evidence was compounded by trial counsel's misrepresentation of Lang's early childhood as "normal." *See* Section III.D *infra*.

954 N.E.2d at 639. The district court, while acknowledging that Lang did not have a "normal" childhood, concluded that the state court's decision was not unreasonable. R. 56 (Dist. Ct. Op. at 45) (Page ID #13130). The majority similarly does not dispute that Lang's childhood was horrific and not "normal," but it rejects Lang's argument on this claim in a scant paragraph. Maj. Op. at 17.

The warden also acknowledges that Lang did not have a "normal" childhood prior to age of ten, and instead centers his argument on the Supreme Court of Ohio's conclusion that this statement was not an inaccurate summary of the mitigation evidence that was actually presented. Appellee Br. at 49. Even considering the paucity of evidence presented regarding Lang's life prior to age ten, the state court's conclusion that the description of Lang's early childhood as "normal" was true strains credulity—as the majority recognizes, Maj. Op. at 17. Lang's mother, Carter, testified that Coffee was physically abusive towards her when she was pregnant with Lang. R. 22-3 (App'x Vol. 29 at 350) (Page ID #8026). Lang's sister, Robinson, corroborated the fact that Coffee was a physically abusive drug addict. *Id.* at 341 (Page ID #8017). Carter testified that Coffee was present in Lang's life after he was born, before he was incarcerated for setting her apartment on fire, raping her, and molesting a child. *Id.* at 350 (Page ID #8026). She also explained that Lang suffered from depression and behavioral problems prior to his abduction at age ten, and that he was prescribed Depakote, lithium, and Respiradol. *Id.* at 357 (Page ID #8033). A characterization of even this partial presentation of the level of abuse and mental illness endured by Lang prior to the age of ten as "normal" is absurd.

Furthermore, the Supreme Court of Ohio's post-hoc rationalization of this argument as strategically designed to "focus the jury's attention on defense counsel's argument that addressed Lang's abuse after his father abducted him," *Lang*, 954 N.E.2d at 639, is unreasonable. Lang's counsel could have accurately characterized Lang's childhood prior to age ten and focused the jury's attention on his abduction by his father; the two arguments are not mutually exclusive, and his counsel could have prioritized one without mischaracterizing the other. *See Wiggins*, 539 U.S. at 535 ("While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder [as opposed to his history], the two sentencing strategies are not necessarily mutually exclusive."). Thus, it is

objectively unreasonable for trial counsel to have summarized inaccurately the mitigation evidence they had presented and, in doing so, to have minimized the influential value of that information. "Counsel's conduct . . . fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as guides to determining what is reasonable." *Id.* at 524 (internal quotation marks omitted); *see* Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11(L) (rev. ed. 2003). ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.").

Because it held that Lang's trial counsel was not constitutionally deficient for making this statement during closing argument, the Supreme Court of Ohio did not reach *Strickland*'s second prong: prejudice. *Lang*, 954 N.E.2d at 639. Thus, we determine de novo the prejudice to Lang from his counsel's argument. *Wiggins*, 539 U.S. at 534; *King*, 847 F.3d at 795. Closing argument is a critical aspect of advocacy in front of a trier of fact. "[N]o aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side . . . ." *Herring v. New York*, 422 U.S. 853, 862 (1975). By minimizing the deprivations endured by Lang in his early childhood about which his mother and sister had testified, Lang's trial counsel undermined key mitigation evidence. The jury deliberated what sentence to impose upon Lang with the false summation of his early childhood as "normal" fresh in their minds. There is a reasonable probability that one juror would have weighed the balance of the mitigation evidence and aggravating circumstances differently if Lang's trial counsel had not misrepresented Lang's early childhood during closing argument. *Wiggins*, 539 U.S. at 537.

Lang has satisfied both prongs of *Strickland*: He has demonstrated that his counsel's erroneous characterization of his early childhood during closing arguments fell below an objectively reasonable standard, and there is a reasonable probability a juror would have reached the opposite decision with regards to the imposition of the death penalty in the absence of this deficiency. Consequently, I respectfully dissent from the majority's contrary holding.

## IV.  CONCLUSION

Although our habeas review is deferential, 28 U.S.C. § 2254(d), and our review of ineffective-assistance-of-counsel claims especially so, *Pinholster*, 563 U.S. at 190, I believe that Lang has overcome this high threshold and proven that he is entitled to relief on three of the five grounds presented.  To take a step back:  A relative of Lang's victim was empaneled on his jury. We have no record evidence of how this affected the jury's verdict of guilt because the trial court's one-question inquiry allowing a response via silence was less than minimal. Furthermore, trial counsel's investigation into mitigation evidence was so haphazard that they did not receive records until after Lang was sentenced to death and barely engaged with Lang's mother, the key mitigation witness.  And in trial counsel's final argument to the jury prior to this sentence of death, counsel falsely described Lang's horrific childhood as "normal."

If the majority is correct that our constitutional rights to an impartial jury and legal representation are so minimal that Lang's trial was constitutionally acceptable, then this case is more about the parsimonious interpretation of our constitutional protections than about the reasonableness of executing a person following this paucity of due process.  *Caudill v. Conover*, 881 F.3d 454, 483 (6th Cir. 2018) (Moore, J., dissenting).  I do not believe, however, that the protections guaranteed by our Constitution are so minimal, or our review so constrained by the standard of review, that we are forced to condone the egregious mistakes that occurred during Lang's trial.  Thus, for the foregoing reasons, I respectfully dissent.